**Ollie McADOO, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 83–CV1866–DT.**

United States District Court, E.D. Michigan, S.D.

Aug. 24, 1984.

Ronald Rader, Detroit, Mich., for plaintiff.

Carolyn Bell Harbin, Asst. U.S. Atty., Detroit, Mich., for defendant.

## OPINION

RALPH B. GUY, Jr., District Judge.

This is an action brought pursuant to the Drivers' Act provisions of the Federal Tort Claims Act, 28 U.S.C. § 1346(b), and 28 U.S.C. § 2679(b).

This litigation arises from an auto accident which occurred on May 16, 1981. The plaintiff, Ollie McAddo, was injured when his vehicle struck a government-owned vehicle that had turned in front of him in the process of making a left turn. Subsequent to the accident, plaintiff filed an administrative claim, pursuant to the provisions of the Federal Tort Claims Act, which administrative claim was denied, and filed this action in a timely manner on May 13, 1983. Although the administrative claim was denied, the Government is *not* contesting liability. Additionally, the Government has abandoned any claim of contributory negligence on the part of the plaintiff and, further, has dropped the counterclaim which it filed with its answer. Liability having been admitted, the issue before the court was the question of damages.

Both parties agree that this auto accident is covered by the provisions of the Michigan No-Fault Act, M.C.L.A. § 500.3101, *et seq.*[1] The Michigan No-Fault Act, as is typical of many state no-fault acts, provides for the elimination of tort liability in auto accident cases unless a certain threshold of seriousness of injury is reached. M.C.L.A. § 500.3135 provides:

(1) A person remains subject to tort liability for *non-economic loss* caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent, serious disfigurement.

(Emphasis added.) The Michigan Act does allow, however, for recovery of damages for "work loss ... in excess of the daily, monthly, and three-year limitations...." M.C.L.A. § 500.3135(2)(c).

Thus, the damage issue before this court involves the following considerations. First, the court must determine whether the plaintiff's injuries reach one of the thresholds set forth in the Michigan Act. In plaintiff's complaint, the only claim made is that the injuries sustained resulted in a "serious impairment of a body function." Accordingly, this is the only threshold consideration that the court need consider.[2] If the court determines that there has been a serious impairment of a body function, then the plaintiff may recover traditional personal injury tort damages, which would include work loss beyond the three-year statutory period. If, however, the court determines that the plaintiff has not met the no-fault threshold, then it still must consider any work loss proved in excess of the daily, monthly, or three-year

1. Although the Sixth Circuit Court of Appeals, in the recent case of *United States v. Ferguson,* 727 F.2d 555 (6th Cir.1984), had indicated that the United States Government is not controlled by the provisions of the Michigan No-Fault Act when it is a plaintiff, the parties here have not raised any question as to the coverage of the Act where the Government is a *defendant.*

2. In closing argument, plaintiff's counsel appeared also to be making a claim that there has been permanent serious disfigurement, as the result of plaintiff having some teeth knocked out in the accident and now having a partial plate. Since this claim is not made in the Complaint or the Final Pretrial Order, there is no necessity for the court to consider it. The court would note, however, that it would rule as a matter of law, had the issue been raised, that loss of teeth requiring a partial plate where there was no adverse cosmetic affect would not result in a serious permanent disfigurement, as that term is used in the Michigan statute.

limitations period. Since the Government has admitted liability, if the plaintiff had substantiated any work loss damages in excess of that reimbursed by his carrier under the no-fault law, then he would be entitled to such damages.

*The Issue of "Serious Impairment of Body Function"*

Of the three conditions precedent to the recovery of non-economic damages set forth in the Michigan No-Fault Act, the one that has presented the most difficulty of resolution is serious impairment of a body function. Obviously, death is absolutely ascertainable. Although reasonable minds can differ as to what constitutes a permanent, serious disfigurement, it has, nonetheless, not presented major decisional difficulties. Relative to the question of serious impairment of a body function, there are a great number of cases decided under the No-Fault Act by both the Michigan Court of Appeals and the Michigan Supreme Court, but the one that is the starting point for this inquiry is *Cassidy v. McGovern*, 415 Mich. 483, 330 N.W.2d 22 (1982). The case is significant because it provides the definitive answer under Michigan law to two important questions: (1) to what extent is the determination of serious impairment of body function a matter of law, and (2) what does the phrase "serious impairment of body function" mean? Since actions under the Federal Tort Claims Act are non-jury trials, the answer to the first question is of minimal significance to these proceedings.[3]

There is no doubt that the phrase "serious impairment of body function" presents some definitional difficulties. In this regard, the Michigan Supreme Court in *Cassidy* stated: "Although the requirement of serious impairment of body function lacks specificity, uniformity in its application is to some extent attainable through statutory construction by the appellate courts." 415 Mich. at 502, 330 N.W.2d 22. As an aid to statutory construction, the Michigan Supreme Court first considered the legislative goals behind the No-Fault Act. Quoting from *Shavers v. Attorney General*, 402 Mich. 554, 578–579, 267 N.W.2d 72 (1978), the court stated: "The goal of the no-fault insurance system was to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses. ... Under this system, victims of motor vehicle accidents would receive insurance benefits for their injuries as a substitute for their common-law remedy in tort." *Cassidy, supra*, 415 Mich. at 498, 330 N.W.2d 22.

The court then went on to explain that no-fault legislation of this nature involved a trade-off. Quoting from 7 Am.Jur.2d, Automobile Insurance, § 340 at 1068, the court illustrated this trade-off:

"It has been said of one such plan that the practical effect of the adoption of personal injury protection insurance is to afford the citizen the security of prompt and certain recovery to a fixed amount of the most salient elements of his out-of-pocket expenses * * *. In return for this he surrenders the possibly minimal damages for pain and suffering recovera-

---

**3.** The responsibility of effectuating the legislative will is primarily a matter of law for the court and not properly left to a determination by a jury. Therefore, we conclude that the meaning of "serious impairment of a bodily function" is a matter to be determined by statutory construction. We hold that where there is no factual dispute regarding the nature and extent of plaintiff's injuries, the question of serious impairment of body function shall be decided as a matter of law by the court. Likewise, if there is a factual dispute as to the nature and extent of a plaintiff's injuries but the dispute is not material to the determination whether plaintiff has suffered a serious impairment of body function, the court shall rule as a matter of law whether the threshold requirement of M.C.L. 500.3135; M.S.A. 24.13135 has been met.

*Cassidy, supra*, 415 Mich. at 502, 330 N.W.2d 22 (citations omitted). Since no dispositive motions were filed in this case, and since no motions were made by the defendant at the close of plaintiff's proof, the court's decision in this matter represents the decision of the trier of fact rather than a ruling as a matter of law. The significance of this distinction is primarily in connection with the different standards of appellate review.

ble in cases not marked by serious economic loss or objective indicia of grave injury, and also surrenders the outside chance that through a generous settlement or a liberal award by a judge or jury in such a case he may be able to reap a monetary windfall out of his misfortune." (Footnotes omitted.) *Cassidy, supra,* 415 Mich. at 500, 330 N.W.2d 22.

Although the *Cassidy* court indicated that the precise perimeters of "serious impairment of body function" would undoubtedly be developed on a case-by-case basis, it nonetheless provided certain very significant benchmarks. Perhaps the most significant was the court's determination that this particular threshold must be considered in conjunction with the other threshold requirements for a tort action for non-economic loss, namely, death and permanent serious disfigurement. In addressing this subject, the court stated that "[t]he Legislature clearly did not intend to erect two significant obstacles to a tort action for noneconomic loss and one quite insignificant obstacle." *Id.* at 503, 330 N.W.2d 22.

Thus, it is clear that the type of impairment of body function which the Michigan Supreme Court envisioned as meeting the threshold requirement is one which will be on a par with such serious consequences as death and permanent serious disfigurement. This might be termed the qualitative norm established by the *Cassidy* decision. The court then provides additional assistance in establishing a quantitative norm:

The language "impairment of body function" is ambiguous regarding whether the impairment must be of *any* body function or of the *entire* body function. On the one hand, if *any* body function were to be considered the intended meaning, arguably a serious impairment of the use of the little finger would meet the threshold requirement. On the other hand, if an impairment had to be of the entire body function, then arguably only life-threatening injuries would satisfy the

requirement. We believe that neither of these options accurately reflect the legislative intent and that impairment of body function is better understood as referring to important body functions. *Id.* at 504, 330 N.W.2d 22.

Since the most significant non-economic loss in traditional tort recovery cases is usally for pain and suffering, the *Cassidy* court also addressed this issue specifically:

Another significant aspect of the phrase "serious impairment of body function" is that it demonstrates the legislative intent to predicate recover for noneconomic loss on objectively manifested injuries. Recovery for pain and suffering is not predicated on serious pain and suffering, but on injuries that affect the functioning of the body. *Id.* at 505, 330 N.W.2d 22.

■ A distillation of the teaching of *Cassidy* then would indicate that, in order for there to be a "serious impairment of body function," as that term is used in the Michigan No-Fault Act, there must be an injury that results in a serious impairment of an important body function, said impairment being evaluated against the backdrop of the other two thresholds—death and permanent serious disfigurement.

■ The cases that have been decided subsequent to *Cassidy* are of some assistance in applying the guidelines of *Cassidy* to specific facts. However, where they provide the least help is in cases of soft tissue injury, such as is involved here. One of the primary problems is that the principal manifestion of a soft tissue injury is pain and suffering. But, since *Cassidy* teaches that pain and suffering in and of itself does not amount to a serious impairment of a body function, the fact of pain and suffering is at best the beginning of an inquiry rather than its end.

*Do Plaintiff's Injuries Constitute a Serious Impairment of a Body Function?*

Turning now to the specific facts of the case at bar, the court must first address an

additional significant complicating factor involved in this litigation.

On May 16, 1981, the plaintiff was involved in the auto accident that is the subject matter of this litigation. However, as living proof that bad luck comes in threes, the plaintiff was also involved in a similar auto accident on December 31, 1980, and a third similar accident on September 29, 1981. Thus, within a period of nine months, the plaintiff was involved in three automobile accidents, none of which involved any broken bones or major injuries and all of which allegedly involved soft tissue injuries. As a result of these three accidents, the plaintiff is or has been involved in four separate lawsuits. One was against the party involved in the December 31, 1980 accident. The second involved a suit against plaintiff's own carrier for first party benefits growing out of the first accident, necessitated by the insurance company terminating benefits, at least in part because of the multiplicity of accidents involved and the inability to differentiate damages, one from the other. The third lawsuit is the instant case, and the fourth is a pending action against the party allegedly responsible for the September 29, 1981 collision. The litigation involving the first accident has been settled for $5,000. Likewise, the claim for first-party benefits against the insurance carrier has been resolved. In fairness to the plaintiff in this action, it should be noted at this point that it would appear that in each of the three accidents he was not at fault. Certainly that is true in the case at bar where the Government has admitted liability. Nonetheless, the three collision lawsuits, all against different individuals and all arising out of different circumstances, have placed the plaintiff in the awkward position of having to put his best legal foot forward in each case, resulting in each injury being the most serious one when it is the injury under discussion. It is also significant to note that plaintiff has claimed that each of the three injuries resulted in a serious impairment of body function. The decision-making process is further encumbered by the fact that plaintiff has chosen to rely on the deposition testimony of a chiropractor for his damage proofs, and the defendant did not even have the plaintiff independently examined, choosing instead to rely on an examination made by a doctor in one of the plaintiff's other cases.

The court will start by examining the medical testimony offered by the plaintiff which purports to support his claim of serious impairment of body function. David Eisman, D.C., a chiropractor, testified on behalf of the plaintiff by way of a deposition taken on July 12, 1984, some four days before the trial started. Dr. Eisman was the person who treated the plaintiff for his injuries after all three of the auto accidents. Although Dr. Eisman maintained a separate file on the plaintiff for each of his three injuries, this was done for the purpose of keeping straight the forms he had to file with the insurance company for each of the three separate accidents. From a medical standpoint, Dr. Eisman had no reason to differentiate in terms of his treatment or diagnoses among the three accidents. Furthermore, Dr. Eisman heads up the Eisman Clinic and was not necessarily the treating physician each time the plaintiff visited the Clinic. Although Dr. Eisman considered the plaintiff his patient, any chiropractor working at the clinic might treat the plaintiff on any given visit. Although the initial diagnosis is couched in the jargon of the profession, when translated, the plaintiff was essentially diagnosed as having soft tissue injury in the cervical and lumbar regions, with evidence of muscle spasms. Insofar as treatment was concerned, the doctor stated: "Conservative treatment was recommended in his case to the affected areas in the form of hot packs, intermittent traction and manipulation and exercises." (Eisman Dep. at 20.) Insofar as the course of treatment was concerned, the doctor stated: "Yes, but again he wasn't seen that often. See, in the beginning of his course of treatment he was in such pain we treated him daily then we cut it down to once a week, once every two weeks and that's what happened after the first accident." *Id.*

As can be seen from the above statement, not only were the injuries similar in the first and second accidents, but the course of treatment was, for all practical purposes, identical. Similarly, after the third accident, the complaints were again identical:

Q. And what were his complaints [after the third accident]?

A. Pains in the neck, back, ribs, left upper and lower extremity, numbness in his hands.

(Eisman Dep. at 26.)

■ The last examination made by Dr. Eisman was one day before the deposition was taken, on July 11, 1984. The diagnoses he made of plaintiff's condition as of that date were: "Post traumatic sprain to the cervical, dorsal and lumbar spine with fibromyositis, radiculopathy in the right upper extremity and in the left lower extremity." *Id.* at 29. A fair translation of the above is that plaintiff had a sprain in the cervical, dorsal, and lumbar regions of his back, with inflammation of muscular tissue (fibromyositis), and pain along the course of nerve roots (radiculopathy). If the inquiry ended there, this court would have little difficulty in concluding that this does not amount to a serious impairment of a body function, since it is exactly the type of soft tissue injury, the chief consequence of which is pain, that *Cassidy* teaches is not to be construed as a serious impairment of a body function.

In order to substantiate the claim of a serious impairment of a body function, however, the plaintiff shifts grounds at this point and addresses not the injury itself but the alleged consequences thereof; that he has not been able to return to work since his *first* accident. There are several problems with the attempt to equate in absolute terms disability from past work with serious impairment of a body function. The first difficulty is the obvious one, and that is that the legislature did not choose to use this as one of the thresholds for continued tort liability. It would have been very easy for the legislature to enumerate a fourth threshold—disability from work.

The fact that they did not do so also is easily understandable when the Act is considered in its entirety. If you are disabled from your work, as the result of the negligence of another, under the No-Fault Act you will be paid by your own insurance carrier for the first three years of your work loss. After that period of time, you may collect from the negligent party any difference between what your carrier paid you and what you would have earned, *plus* any future work loss. In the case at bar, the plaintiff is entitled to be compensated for any future work loss caused by this defendant (and liability is admitted) without regard to whether he has met the threshold of serious impairment of a body function.

In other words, what the legislature has said is that insofar as your economic well being is concerned—your work loss—this will continue to be evaluated under traditional tort principles. After three years, a defendant is responsible for work loss indefinitely or at least for such period of time as a causal realtionship can be established. On the other hand, the legislature has enacted strict limitations on pain and suffering damages, as this is always the nebulous area in all personal injury litigation. The legislature has taken away from those injured in auto accidents their right to participate in the judicial pain and suffering lottery, and substituted therefor a scheme which guarantees them quick payments without regard to fault for those injuries and economic consequences which are the most commonplace in auto accidents. Thus, the attempt to measure the seriousness of the impairment of a body function by its consequences in the work place is not only a distortion of the legislative scheme but an unnecessary one, since the legislature has preserved traditional tort remedies insofar as work loss is concerned. The classic example would be the concert violinist who would lose the tip of his finger and no longer be able to play the violin. Although the immediate financial consequences to him from not being able to pursue his chosen profession might be extremely significant, there is no way in

which the loss of the tip of a little finger reasonably could be equated to a serious impairment of a body function. Once again, although admittedly repetitious at this juncture, one need shed no tears for our hypothetical concert violinist, because if the loss of his little finger was occasioned by the negligent act of a collectible third party, he would have his cause of action for future work loss.

■ In summary, this court concludes that when one has suffered a back sprain, the only treatment administered being limited to manipulation and heat treatments by a chiropractor, this simply does not result in the type of serious impairment of a body function contemplated by the legislature of the State of Michigan.

The reference to chiropractic treatment is not intended by this court as pejorative, nor does the court wish to sally forth into the continuing debate between the medical profession and those members of related healing arts. There is an objective significance, however, to the involvement of chiropractic treatment. Chiropractors by law are very limited in what they can do and what they can administer, and something is said about an injury if a given individual is content to treat that injury solely within the confines of chiropractic medicine.

■ In the interest of a complete record, it should be noted that plaintiff did see two medical doctors in connection with this litigation. He saw Dr. Gunabalan, a self-proclaimed specialist in the field of thermography. The court refused to allow Dr. Gunabalan's testimony into evidence . because, applying the test of the Sixth Circuit in *United States v. Brown*, 557 F.2d 541 (6th Cir.1977), this court concluded that thermography, as a diagnostic tool for back injuries, has not received that degree of

acceptance necessary within the scientific community to be admissible into evidence.[4]

Plaintiff was also referred to Victor C. Gordon, a doctor of osteopathy. Unfortunately, however, neither the plaintiff nor the defendant took Dr. Gordon's deposition or otherwise attempted to present his findings to the court, other than to include in a packet of Dr. Eisman's records a report submitted by Dr. Gordon. (Def. Ex. 6). One of the problems with the exhibit is that it is a photocopy, and some of the significant findings of Dr. Gordon are illegible or have not been reproduced at the bottom of one of the pages. It does appear, however, that Dr. Gordon administered an electromyograph examination, an accepted medical diagnostic technique, and found that there were no electromyographic abnormalities seen.

He did indicate "incipient carpal tunnel syndrome" but neither the plaintiff nor the defendant made any attempt to relate this to the question at issue before the court.

Before leaving the subject of medical testimony as it relates to the question of serious impairment of body function, it should be noted that the defendant also introduced the results of an examination of the plaintiff conducted by Dr. Boris W. Kreel, a medical doctor specializing in occupational medicine and rehabilitation of patients with disabilities. Dr. Kreel examined the plaintiff on February 1, 1982, and concluded:

In spite of his subjective symptoms and without trying to minimize any of his complaints, there are no positive physical findings on today's examination as far as the car accident is concerned. There is no clinical evidence to support any of his complaints. As just indicated, as far as today's evaluation is concerned, he was

4. The court had the parties make a separate record on this issue. Since the question involved a preliminary determination as to the admissibility of evidence, under the Federal Rules of Evidence, the court was free to consider matters whether they were themselves admissible into evidence or not. The plaintiff presented a series of articles primarily from *legal* publications touting the value to *lawyers* of

thermography as a diagnostic technique. The Defendant presented a letter from the American Medical Association to the effect that thermography, as it relates to the diagnosis of back injuries is still considered an investigative technique. On the basis of this evidence the court concluded that the evidence did not meet the *Brown* test.

completely within normal limits as far as the car accident is concerned; both in the general physical examination and in the neuromuscular part of the evaluation where most of the time was spent.

\* \* \* \* \* \*

X-rays do show some minimal degenerative changes, more so in the LS spine than in the rest of the back. They also showed some possible collapse of the 5th lumbar vertebra. This is the basis, in my opinion, for his complaints. These weren't caused by the car accident, but they certainly could cause low back discomfort because of the mal-alignment that they would produce on the facet joints. It is my opinion, given the above facts, that he has had a full recovery with no residuals from the car accident....

\* \* \* \* \* \*

Because he is long since had a full recovery, he could return to full, unrestricted employment and activity immediately. There certainly is no indication for any specialized tests, specialist evaluations, hospitalizations, or medication. Nor is there any indication for any treatment. I think the fact that he has received chiropractic manipulations is both illogical and not scientific. Chiropractic manipulations are based upon what is referred to as the presence of subluxations of the small joints of the spine. A subluxation means a partially or incompletely dislocated joint. No such thing exists anywhere in this man's back. If it had existed, then one manipulation should have been sufficient to replace this partially or incompletely dislocated joint. Anything beyond one or two manipulations is totally illogical.

(Kreel Dep. Ex. 1 at 10–11.)

■ Given the nature of the testimony in this case, the court would also indicate that, as an alternative basis for holding that there is no serious impairment of a body function, it credits the testimony of Dr. Kreel, the medical doctor and occupational medicine specialist, over that of Dr. Eisman, the chiropractor. Dr. Kreel's testimony is totally supportive of a finding of no serious impairment of a body function.

Having thus resolved this question, the court must now turn its attention to the issue of what damages, if any, the plaintiff is entitled to as a result of work loss occasioned by the admitted negligence of the defendant.

*To What Work Loss Damages, if any, is the Plaintiff Entitled?*

This issue presents two questions for resolution by the court. The first involves causation. Even though the defendant has admitted fault, the court must still determine that such fault was a proximate cause of plaintiff's injuries. If the court determines that fault of the defendant was a proximate cause of plaintiff's injuries, then it must determine what damages, if any, are appropriate.

For the reasons hereinafter stated, the court concludes that the injuries sustained by the plaintiff in the May 16, 1981, auto accident were a substantial contributing proximate cause to the physical conditions which resulted in plaintiff's inability to work.

■ It is settled law in Michigan that a defendant's negligent conduct which results in an aggravation of a plaintiff's previous injury or medical condition will result in liability for damages. *Rypstra v. Western Union Telegraph Co.,* 374 Mich. 166, 132 N.W.2d 140 (1965). This principle of law is significant in light of the fact that this plaintiff sustained similar injuries in a previous auto accident some five months earlier. Also, the x-rays taken of the plaintiff reveal that he suffers from degenerative arthritis in the cervical area. This, of course, is a condition unrelated to any of the accidents.

The conclusion that the accident that is the subject matter of this litigation aggravated both the injuries plaintiff had sustained in the first accident and his arthritic condition is supported by the testimony of the plaintiff himself, as well as by his treating chiropractor, Dr. Eisman. The plaintiff testified that he had worked regularly all

his life until the first accident which occurred on December 30, 1980. He further testified that he had recovered sufficiently from the first accident so that he was planning to return to work on the Monday that followed the date of his second accident. That he had a job to go back to and that he was expected back at work was corroborated by his former employer. In order to indicate why the court credits plaintiff's own testimony in this regard, it is helpful to detail briefly plaintiff's work history.

Plaintiff was born on June 24, 1920, and, at the time of the accident in issue here, he was 61 years of age. Plaintiff had spent 36 or 37 of these years in full-time employment. Thirty of those years were spent working at Detroit Steel Products in this area, which job ended in the late 1970's, when the plant closed. Approximately contemporaneously with the closing of the plant, the plaintiff began working for Suburban Brick Company in Fraser, Michigan. Plaintiff worked for this company as an independent yard contractor, on and off, for a period of several years, apparently commencing in 1977. The owner of Suburban Brick Company, Robert Schroeder, testified at trial, and indicated that he considered the plaintiff dependable and hard working, and that he would have continued to employ him but for the disability occasioned by plaintiff's auto accidents. Thus, plaintiff's continuous record of employment and indications that all was going well on the job at which he was working lend support to his own testimony that, but for the auto accidents, he would still be working.

■ Also, Dr. Eisman testified that plaintiff's three auto accidents and their interreaction with his arthritic condition were the cause of his not being able to return to work. The fact that one cannot completely differentiate between what damage was done by which accident is not fatal to plaintiff's claim, since Michigan law dictates that where the court or jury is unable to separate damages caused by a defendant's conduct from those which were preexisting, then the entire amount of plaintiff's damages must be assessed against the defendant. *Belue v. Uniroyal, Inc.,* 114 Mich.App. 589, 319 N.W.2d 369 (1982).

■ Dr. Kreel, whose deposition testimony was offered by defendant, strongly disagrees with plaintiff's contentions as to the seriousness of his injuries, but does not negate the fact that whatever injuries plaintiff is suffering from were caused by one or more of the auto accidents in which he was involved within a nine-month period of time.

Having thus concluded that the auto accident of May 16, 1981, was a contributing proximate cause to plaintiff's injuries which resulted in his work loss, the court must next turn to what amount of damages is appropriate. This issue is complicated by the nature of plaintiff's injuries, the relatively sketchy nature of his proofs on money damages, and the inherent uncertainty that is always involved with the assessment of future damages.

There are two components to plaintiff's damage claim—past damages up to the date of judgment and damages into the future. The court will first examine that portion of the claim relating to damages from date of injury to date of judgment.

Through plaintiff's last employer, Suburban Brick Company, the plaintiff introduced records of earnings for the years 1977, 1978, 1979, and 1980. These earnings were as follows:

| | |
|---|---|
| 1977 – | $ 2,032.10 |
| 1978 – | $ 6,627.99 |
| 1979 – | $17,318.13 |
| 1980 – | $13,737.52 |

Although these records are helpful, there are a number of problems in utilizing them as a basis for damage computations. First is the fact that there is little specific information beyond 1980 bearing on this question. This lack of information is further complicated by the fact that the plaintiff did not have a regular job as an employee with Suburban Brick Company. He was an independent contractor and his work varied in proportion to its work. The owner of Suburban Brick Company testified that 1981 was about as good a year as 1980, but that 1982 was a bad year. He also testified

that 1983 was a better year than 1982, but not as good as 1981. If one were to ascribe arbitrary values to this general testimony, it could be said that plaintiff's projected income for 1981 would equal that of 1980—$13,737.52; that 1982 would have resembled more closely 1978, thus resulting in a projected income of approximately $7,000.00 per year; and that 1983 would have fallen somewhere in between—approximately $10,000.00.

Relative to income, however, the defendant brought out on cross-examination some significant information that plaintiff did not include in his damage proofs. The plaintiff was an independent contractor and, as such, was responsible for all of his own expenses. Therefore, any wages earned must be off-set by any sums that plaintiff would have expended in fulfilling his job responsibilities. On this issue, the defendant introduced plaintiff's 1980 income tax return (DX 17), which indicates gross income in the amount of $13,737.52, but indicates as a deduction therefrom business expenses in the amount of $8,791.91, leaving an adjusted gross income of $4,945.61. Plaintiff made no effort to negate or further explain these deductions and made no effort to show that they were atypical. Thus, plaintiff's business expenses were running 64 percent of his business income.[5]

■ Since, under Michigan no-fault law, the responsibility for reimbursing plaintiff for his work loss for the first three years after his accident rests with his insurance carrier, the court need only concern itself with work-loss damages occurring after May 16, 1984.[6] It can reasonably be assumed that judgment will enter in this matter on or about August 16, 1984, so that, insofar as present damages are concerned, the court has only to compute damages for the period of time from May 16, 1984 until August 16, 1984, a three-month period. Since 1984 has been an improved year in the economy in general, it is reasonable to conclude that plaintiff would have earned in 1984, had he been working, approximately what he would have earned in 1980—$13,737.52. Reducing this amount to the three-month period covered between May 16, 1984 and August 16, 1984, the court reaches the figure of $3,434.37. Since, as previously determined, however, 64 percent of this figure would have been consumed by business expenses, it is only 36 percent of that figure that can be considered wage loss, or $1,236.37. For ease of future computation, this translates into a monthly rate of $412.12.

■ Turning now to future damages, the court believes it is safe to conclude that the plaintiff would have worked the balance of this year, and thus, from August 16, 1984 until December 31, 1984, a period of four and one-half months, at $412.12 per month, would have netted an additional $1,854.56.

The next, and admittedly the more difficult, question is how far in the future would the plaintiff have continued to work but for his auto accident injuries. The plaintiff's own testimony is not very helpful in this regard, as he indicated he would have planned to work fifteen or twenty more years. Neither plaintiff nor defendant attempted to offer any type of statistics such as are available from the Labor Department indicating average work life. Based upon the plaintiff's past work history and his general good health prior to the accident, albeit with degenerative arthritis,

---

5. Using one year as a basis for determining a ratio between income and expenditures is obviously less than desirable, if one is attempting to make an accurate statistical analysis. However, it must be remembered that plaintiff only worked at his last employment for approximately four years, and further, to the degree the court does not have more information to work with, it is because the plaintiff gave the court no more information to work with. Also, to the degree that the expenses might seem high, it must be remembered that they include, in part, the payment for additional manpower which the plaintiff sometimes used to assist him.

6. Although plaintiff, under the law, could have presented a claim for any difference between what his insurance carrier reimbursed him during that three-year period and what he would have earned, he offered no proofs on this issue so the court must conclude that plaintiff makes no claim for any wage loss during the three-year period immediately following his accident.

the court concludes the plaintiff would have worked until his 70th birthday. This figure also comports with the compulsory retirement age allowable under the Federal and State Age Discrimination Acts. Plaintiff would reach age 70 on June 24, 1990.[7] It is thus necessary to compute future damages for the plaintiff for a period of six years. Again, the court believes that it is fair, under the circumstances, to use the 1980 income figure of $13,737.52. The court has hereinabove indicated that that figure, when adjusted for expenses, gives a net-monthly income of $412.12. When this figure is multiplied by the number of months (66) until plaintiff reaches his 70th birthday at the end of June in 1990, the result is $27,199.92. To this amount must be added the figures previously computed covering the period from May 16, 1984 until the end of 1984, which total $3,090.93, giving a grand total of $30,290.85.

This net damage amount of $30,290.85 must be adjusted, however, for the law is clear in Michigan that all future damages must be reduced to present cash value. *Currie v. Fiting*, 375 Mich. 440, 453–454, 134 N.W.2d 611, 615–616 (1965). Thus, that portion of the damage figure which represents the period from August 17, 1984, to June 24, 1990, i.e., $29,054.48, must be further reduced to reflect present value. The historical rate used in Michigan for reduction to present value was five percent. Although this percentage is arguably low in light of today's present economy, it continues to be approved by Michigan appellate courts. *Tiffany v. Christman*, 93 Mich.App. 267, 287 N.W.2d 199. Since the parties offered no testimony on any other rate that would be appropriate, this court will use the five percent rate. Without burdening this opinion further

with the torturous arithmetic involved in reducing to present value, suffice it to say that the future damage award, reduced to present value, equals $24,912.38. Adding to this figure the present damages of $1,236.37, the court concludes that the total damage award is $26,148.75.

The plaintiff concedes that he has arrived at a settlement with the tortfeasor involved in the first accident, and that that settlement, in the amount of $5,000.00, is properly deducted from this award. Therefore, deducting the $5,000.00 gives an adjusted damage award to the plaintiff of $21,148.75. Plaintiff may have judgment in this amount.[8] Plaintiff is to present a judgment, consistent with this Opinion, within fourteen (14) days from the date of this Opinion.

---

**7.** The Life Expectancy Tables, which the court is able to judicially notice, present no problem in this regard, as they give the plaintiff a life expectancy beyond age 70.

**8.** The testimony at trial indicated that plaintiff is currently drawing social security benefits. However, such benefits would not be a deduction from this damage award, since plaintiff started drawing them at age 62 under the provisions of the Act that allow him to collect his normal social security at that age. He is not

drawing social security disability benefits. Also, there were some vague testimonial references by the plaintiff to the effect that he may have some future medical expenses, and that he could continue to need help around the house. Although these items arguably could be included as a matter of law in any damage award, as a matter of fact no evidence was offered by plaintiff which would enable the court to possibly attach any dollar value, other than through the type of speculation which is impermissible.