Gerald T. **CHERICO**

v.

**NATIONAL RAILROAD PASSENGER CORP.**

Civ. A. No. 88–9346.

United States District Court,
E.D. Pennsylvania.

Feb. 12, 1991.

Robert M. Ross, Philadelphia, Pa., for plaintiff.

Richard L. Goerwitz, Jr., Philadelphia, Pa., for defendant.

### MEMORANDUM

O'NEILL, District Judge.

#### I. *Introduction*

This action arises under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 *et seq.* (1986 and 1990 Supp.). Plaintiff, who was a car repairman, was injured in a collision at one of defendant's Delaware facilities in 1988. At trial, plaintiff wishes to introduce the testimony of Dr. Pierre LeRoy, who has extensive experience in thermography, a technique of measuring the body's heat emission patterns which Dr. LeRoy has used to help diagnose and treat certain musculoskeletal injuries, including plaintiff's.[1] Defendant has moved pursu-

ant to Federal Rules of Evidence 702, 703 and 403 to preclude plaintiff from introducing all thermographic evidence, including the results of thermograms and the testimony of Dr. Pierre LeRoy as it refers to thermograms or any opinions based on thermograms.

#### II. *Discussion*

##### A. Exclusion under Rule 702

Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Defendant argues that the thermographic evidence should be excluded under Rule 702 because it does not meet the legal standard for admissibility set out by the Court of Appeals for the Third Circuit in *U.S. v. Downing*, 753 F.2d 1224 (3d Cir. 1985). Memorandum of Law in Support of Defendant's Motion in Limine at 1–6. Plaintiff agrees that *Downing* is the proper standard but argues that he has submitted evidence sufficient to satisfy the *Downing* criteria. Plaintiff's Memorandum of Law Contra Defendant's Motion in Limine at 9. I agree that the *Downing* standard applies. *See In re Paoli*, 916 F.2d 829, 856 (3d Cir.1990) ("When it is a scientist's methodology that is being attacked, in contrast to the data relied on, the court must analyze the reliability of that methodology under *Downing* (and Rule 702)") (citing *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d 941 (3d Cir.1990).

*Downing* requires a court that is

ruling upon the admission of (novel) scientific evidence, i.e. evidence whose scientific fundaments are not suitable candidates for judicial notice, [to] conduct a preliminary inquiry focusing on (1) the

---

1. At the time he supervised the thermograms performed on plaintiff Cherico, Dr. LeRoy had already reached his "gross clinical diagnoses" of

plaintiff's condition. Deposition of Pierre LeRoy, August 24, 1989 at 43.

soundness and reliability of the process or technique used in generating the evidence, (2) the possibility that admitting the evidence [will] overwhelm, confuse, or mislead the jury, and (3) the proffered connection between the scientific research or test result to be presented, and particular disputed factual issues in the case.

*Id.* at 1237, quoted in *In re Paoli*, 916 F.2d at 856.

Defendant challenges the plaintiff's thermographic evidence under each prong of the *Downing* test. I will examine each in turn.

### 1. Reliability

The *Downing* court listed several relevant criteria to evaluate the reliability of a scientific procedure, including whether it is scientifically accepted, whether it is a novel procedure and whether specialized literature exists that deals with the technique. *Downing*, 753 F.2d at 1238; *see also* Memorandum of Law in Support of Defendant's Motion in Limine at 2, 4. Additional components of reliability include "the frequency with which a technique leads to erroneous results" and the offering of expert testimony in earlier cases to support or dispute the merits of a particular procedure. *Downing*, 753 F.2d at 1238–39. My evaluation of these criteria leads me to conclude that thermography survives the reliability prong of the *Downing* test.

The use of thermography as a diagnostic and treatment tool is controversial. Defendant has submitted one article from a medical journal that concludes that the method is still in an experimental phase as a diagnostic tool for musculoskeletal problems, *see* Edeiken, J. and Shaber, G., "Thermography: a reevaluation," *Skeletal Radiology* (1986) and another that concludes that thermography has no value as a diagnostic tool for sciatica due to intervertebral disc disease, *see* Mahoney, L., McCulloch, J. and Csima, A., "Thermography in Back Pain: Thermography as a Diagnostic Aid in Sciatica," 7 *Orthopaedic Transactions* 43 (1983). Defendant also has submitted the results of a survey showing that the vast majority of members of an association of orthopaedic surgeons do not use thermography or consider it helpful for evaluating neck and back pain. *See* Ash, C. and Foster, M., "Neuromuscular Thermography in Orthopaedic Surgery: A Usage Poll," 17 *Orthopaedic Review* 589 (June, 1988). Finally, defendant has submitted a 1983 report by the American Medical Association that explained that, while results of thermography correlated reasonably well with other imaging methods in patients with upper and lower back pain, there was "no convincing evidence yet that they provide a significant improvement in sensitivity or specificity over other more familiar diagnostic techniques" for lower back pain and must therefore "still be considered investigational and not yet established for this purpose." *See* A.M.A. Council on Scientific Affairs, Thermography in Neurological and Musculoskeletal Conditions, April 8, 1983, at 2, 7, 11 (thermography may be useful in the diagnosis of some musculoskeletal conditions and in documenting soft tissue injuries but does not stand alone as a primary diagnostic tool).[2]

Plaintiff has demonstrated that thermography also has its proponents. In an article in *Spine*, the authors concluded that lumbar thermography "should play an important role in the diagnostic screening of low-back pain syndrome patients." Chafetz, N., Wexler, C. and Kaiser, J., "Neuromuscular Thermography of the Lumbar Spine with CT Correlation," *Spine* 922 (1987); Plaintiff's Exhibit C.

The proceedings of the 1985 meeting of the Academy of Neuro–Muscular Thermography published in *Postgraduate Medicine* include seventeen clinical studies that provide support for the accuracy and helpful-

**2.** Defendant represents that the A.M.A. maintains "the position that thermography is experimental." Memorandum of Law in Support of Defendant's Motion in Limine at 4–5. The status of the A.M.A. Report is uncertain, however, as the House of Delegates of the American Medical Association has formally requested the Council to "reconsider its report on thermography as new information and data become available," *see* Letter from American Medical Association to Squire, Sanders & Dempsey, July 14, 1988.

ness of thermography in various diagnostic and treatment settings. *See* Plaintiff's Exhibit D. For example, Jay Rosenblum, M.D., an assistant professor of neurology at New York University School of Medicine, concluded that his study of three hundred eighteen patients complaining of pain "provide[s] evidence for the objectivity of thermography as a clinical procedure." Rosenblum, J., "Documentation of thermographic objectivity in pain syndromes," *Postgraduate Medicine* 59 (1986). An assistant professor of neurology from the University of Minnesota School of Medicine concluded from a comparative study that the results of thermographic evaluations for pain were "well correlated" with other tests more commonly used, which "serves to document the clinical usefulness and reliability of cutaneous thermal imagery for the evaluation of pain." Hubbard, J., "Statistical review of thermology in a neurology practice: pain evaluation," *Postgraduate Medicine* 65 (1986). *See also* Harway, R., "A comparison of the results of thermography, computerized tomography scanning and myelogram evaluations in 66 patients with lumbar pain," *Postgraduate Medicine* 73 (1986) ("thermography offers a highly sensitive and accurate test that shows a positive correlation" with other diagnostic tests for pain of lumbar origin); Green, J. et al., "Electronic infrared thermography and the relationship to other neurodiagnostic modalities," *Postgraduate Medicine* 74 (1986) ("thermography offers a reliable clinical tool for the evaluation of radiculopathy disorders").

Finally, I may consider the conclusions of other courts which have considered the admissibility of thermographic tests and opinions based on them. *Downing*, 753 F.2d at 1239. Most recently, Judge Huyett of this court allowed a plaintiff to introduce evidence relating to his thermographic test results and at the conclusion of the trial denied defendant's motion for a new trial based on the admission of this evidence. *McClain v. Dixie Auto Transport*, 1989 WESTLAW 6583 (E.D.Pa. Jan. 27, 1989). Judge Huyett held that thermography satisfied the *Downing* criteria and noted that "although thermographic testing is a rela-

tively recent, and not wholly uncontroversial, means of medical diagnosis, I am satisfied that plaintiff has met his burden of showing the objectivity and reliability of such testing." *Id.* Other courts have also found thermography to be a medically acceptable diagnostic technique. *See Tenuta v. Heckler*, 606 F.Supp. 624, 628 (E.D.Wis. 1985) (thermographic procedure is "increasingly acknowledged in the medical community as objective, credible evidence of the existence or nonexistence of chronic pain"); *Hutchinson v. Consolidated Rail Corporation*, No. 84–2345 (E.D.Pa.1985), slip op. (expert testimony on thermographic tests and on reliability of thermography allowed).

The decisions cited by defendant are distinguishable as each relied on a narrower standard for admissibility than the *Downing* standard. The courts in *McAdoo v. United States*, 607 F.Supp. 788 (E.D.Mich. 1984), *Szmodis v. Geiger*, 41 Lehigh L.J. 404 (1985) and *Burkett v. Northern*, 43 Wash.App. 143, 715 P.2d 1159 (1986), *review denied*, 106 Wash.2d 1008 (1986) excluded thermographic evidence or held it improperly admitted by applying more rigid admissibility standards based on the "general acceptance" rule of *Frye v. U.S.*, 293 F. 1013 (D.C.Cir.1923). *Frye* is not the law of this Circuit. The Court of Appeals for the Third Circuit adopted a more relaxed standard for the admissibility of novel scientific methods in *Downing*, in which the Court explicitly expanded the narrow "acceptance" rule of *Frye*. *Downing*, 753 F.2d at 1238.

The *McAdoo* opinion is further distinguished because the proponent of the thermographic evidence there submitted only legal articles pertaining to the usefulness of thermography to litigation, as opposed to the plaintiff's submissions here, which address its usefulness to medical diagnosis. *McAdoo*, 607 F.Supp. at 795 n. 4; Plaintiff's Exhibits C, D. Nor did the proponent of thermographic evidence in *Burkett* submit any medical evidence to support the reliability of thermography beyond the assertions of the doctor who testified. *Burkett*, 715 P.2d at 1160–61.

In their recent opinion in *In re Paoli*, the Court of Appeals for the Third Circuit explicitly directed that "in making reliability determinations, courts must err on the side of admission rather than exclusion." 916 F.2d 829, 857 (3d Cir.1990). Although the *Paoli* court reiterated the *Downing* instruction that the reliability inquiry must be "flexible and may turn on a number of factors," *id.* (quoting *Downing*, 753 F.2d at 1238), the *Paoli* Court elaborated on how a district court should apply the reliability prong of the test: "it is clear that if there were evidence in this record that meta-analysis is inaccurate as a mode of analysis—that the concept of combining raw data from different independent studies and re-analyzing it in total does not render accurate results—then there might be grounds for excluding meta-analysis." *In re Paoli*, 916 F.2d at 857. The Court explained that despite evidence on the record showing that "half the time you shouldn't believe meta-analysis," "that does not mean that meta-analyses are necessarily in error. It means that they are, at times, used in circumstances in which they should not be." *Id.*

Defendant has not submitted evidence that thermography is "inaccurate as a mode of analysis," *In re Paoli*, 916 F.2d at 857, but challenges its use as a "diagnostic tool" to show "heat patterns correspond to nerve damage in the patient's spine." [3] Memorandum of Law in Support of Defendant's Motion in Limine at 1, 3. In light of the documents submitted by plaintiff and because I must "err on the side of admission rather than exclusion," *In re Paoli*, 916 F.2d at 857, I conclude that plaintiff's thermographic evidence meets the reliability criteria of the *Downing* test.

**3.** Elsewhere, defendant concedes that it "does not dispute the value of thermography for many purposes" and re-frames the issue as "whether or not [thermography] has recognized value for the use to which Dr. LeRoy has put it in this case and defendant submits that it is definitely not an accepted procedure for this specific purpose." Defendant's Reply to Plaintiff's Answer to Defendant's Motion in Limine at 1. I find that plaintiff has submitted evidence sufficient to answer affirmatively the issue as framed by defendant.

### 2. Confusing & misleading to the jury

■ Defendant argues that the admission of thermographic evidence would confuse and mislead the jury because "a jury of lay people is likely to give credance (sic) to the testimony of a doctor whether or not his subject is legitimate." Memorandum of Law in Support of Defendant's Motion in Limine at 5. I am not persuaded by defendant's argument. I have concluded that thermography is sufficiently "legitimate" to admit into evidence. In addition, the standard jury charge, which the jury might well hear should this case proceed to trial, contains an instruction "not [to be] bound by an expert's opinion," but to "accept or reject it, as in the case of other witnesses." Pa. SSJI (Civ) 5.30 (1981).

### 3. Connection to disputed factual issue

■ Defendant argues that the issue in this case is "who is responsible for causing [Cherico's] accident," and since "thermograms provide no information in this regard [that] they should not be admitted." Memorandum of Law in Support of Defendant's Motion in Limine at 6. I am unpersuaded by this argument because the jury may also reach the issue of plaintiff's damages.

### B. Exclusion under Rule 703

■ Defendant argues for exclusion under Fed.R.Evid. Rule 703 [4] for the first time in its supplemental brief, where it argues that "the issue in this case is whether Dr. LeRoy was entitled to rely upon thermograms to support his opinions and, whether any opinions, which relied upon thermograms, are appropriate and admissi-

**4.** Federal Rule of Evidence 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

ble." Defendant's Supplemental Letter Brief at 1. I need not address this argument again under Rule 703 since it is more appropriately made under Rule 702 and defendant argued this point in its initial brief. I have already disposed of defendant's Rule 702 objections. *See In re Paoli*, 916 F.2d at 856–57 ("Rule 703 is satisfied once there is a showing that an expert's testimony is based on the type of data a reasonable expert in the field would use in rendering an opinion on the subject at issue; it does not address the reliability or general acceptance of an expert's methodology") (citing *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d 941, 953 (3d Cir.1990).

## C. Rule 403

■ Defendant also argues in its supplemental brief that the thermographic evidence should be excluded under the balancing procedure required by Rule 403, which allows the exclusion of relevant evidence where its probative value is outweighed by the danger of misleading the jury.[5] Defendant cites no authority for this argument. Moreover, my conclusions above regarding the possibility of jury confusion also dispose of defendant's objections under Rule 403.

## III. *Conclusion*

For the reasons above, I will deny defendant's motion in limine to exclude evidence relating to plaintiff's thermographic test results.

---

**5.** Federal Rule of Evidence 403 provides in full: Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.