

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-16-00010-CV

_____

KAY PLUNKETT, INDIVIDUALLY AND AS SURVIVING SPOUSE OF CURTIS
PLUNKETT; CHANDRA ANDERSON, INDIVIDUALLY AND AS SURVIVING CHILD OF
CURTIS PLUNKETT; AND JEFF PLUNKETT, INDIVIDUALLY AND AS SURVIVING
CHILD OF CURTIS PLUNKETT, Appellants

V.

CHRISTUS ST. MICHAEL HEALTH SYSTEM; CHRISTUS HEALTH ARK-LA-TEX D/B/A
CHRISTUS ST. MICHAEL HEALTH SYSTEM, JACOB DUKE, D.D.S., JACK L. ROYAL,
M.D., THOMAS A. HUNLEY, M.D., GREGG ANDERSON, CRNA, JASON YOST, M.D.,
AND MARK SUTHERLAND, M.D., Appellees

On Appeal from the 202nd District Court
Bowie County, Texas
Trial Court No. 13C0522-202

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

The tragic death of Curtis Plunkett, herein called Curtis, came six days after a breathing crisis he experienced just hours after Jacob Duke, D.D.S., had treated Curtis' broken jaw and had wired it shut at Christus St. Michael Hospital.[1]  Just why the breathing crisis and the resulting death occurred was the focus of the conflicting evidence heard by a jury, which found in favor of Duke and the Hospital.  From a take-nothing judgment, Curtis' family members,[2] herein collectively called Plunkett, appeal complaining of three particular rulings of the trial court.

We affirm the trial court's judgment, because (1) it was not error to overrule Plunkett's for-cause challenge of jury panelist Jones, (2) it was not error to admit the testimony of expert witness Stephen Koch, M.D., and (3) it was not error to admit the testimony of expert witness Charles Bloomer, D.D.S.

Curtis was admitted to the Hospital in April 2010, after he fell at home and fractured his jaw.  Duke performed an open reduction with internal fixation of the jaw.  At the conclusion of the procedure, Duke wired Curtis' jaw closed.  Duke also placed a Dobhoff tube for feeding purposes.  Plunkett contends that this tube was grossly malpositioned.  After a brief recovery in the post-anesthesia care unit, Curtis was transferred to a patient room.  Approximately fifteen minutes following this transfer, Curtis experienced breathing problems, and a "Code Blue" was called.

---

[1]Christus St. Michael Health System operated a hospital, located in Texarkana, and was also sued as Christus Health Ark-La-Tex d/b/a Christus St. Michael Health System.

[2]Plaintiffs were Kay Plunkett, individually and as surviving spouse of Curtis Plunkett; Chandra Anderson, individually and as surviving child of Curtis Plunkett; and Jeff Plunkett, individually and as surviving child of Curtis Plunkett.

Although efforts were made to restore his ability to breathe, Curtis suffered severe respiratory acidosis resulting in brain damage.[3] Curtis died after life support was withdrawn six days later.

Plunkett sued the Hospital and Duke[4] for alleged medical malpractice causing an upper airway obstruction leading, sequentially, to respiratory arrest, cardiac arrest, severe anoxic brain injury, and death.[5] A jury found no negligence on the part of the Hospital or Duke.

*(1)        It Was Not Error to Overrule Plunkett's For-Cause Challenge of Jury Panelist Jones*

During jury selection, Plunkett's counsel explained that the burden of proof in a civil case is a preponderance of the evidence. To provide clarity, this burden was contrasted with that of clear and convincing evidence. Counsel addressed the panel on this point:

> This is a case about money damages, and so the law says we have to prove our case by a simple preponderance of the evidence. So again, if we've got 50 pounds on the left, 50 pounds on the right, it's dead even and the Plaintiffs have not proven their case by a preponderance of the evidence. However, if a single feather of the greater weight and degree of credible evidence is on the Plaintiffs' side on the left, then we've proven our case by a preponderance of the evidence, and under the law and the instructions to be given you by the judge if you're on the jury, you must return a verdict for the Plaintiffs. Does everybody understand that? A feather, folks. That's all it takes.

Counsel then asked the panel if they would require "more than a feather" in a malpractice case. Panel member Angela Jones, among others, gave a positive response to this question by raising

---

[3]A respiratory therapist immediately responded to the code and provided oxygen via Ambu bag. An emergency room physician who responded to the code placed a nasotracheal tube through the nose, but Curtis' condition ultimately continued to decline. A cricothyrotomy was attempted to establish an airway through the throat, but that procedure was not successful.

[4]Plunkett also sued Jack L. Royal, M.D., Thomas A. Hunley, M.D., Gregg Anderson, CRNA, Jason Yost, M.D., and Mark Sutherland, M.D. The claims against these defendants were either non-suited or dismissed before trial.

[5]The Plunketts contend that the Dobhoff tube was misplaced within the esophagus, causing laryngospasm—a spasm of the laryngeal muscles—with severe, sudden, and complete occlusion of the airway.

her juror card. When asked to describe her feelings on this issue, Jones stated that she performs investigations as a social worker in which she has to look at both sides. She stated that she would need something "along the line" of clear and convincing evidence before she could find against a hospital or a doctor in a malpractice case, even though she has not heard any evidence. Questioning continued at the bench, whereon Jones indicated that she would follow the law and that her decision would be based solely on the law and the evidence presented. Jones further affirmed to counsel for Plunkett that she "would go by what the law states . . . regardless of what [her] belief would be."

At the conclusion of jury selection, Plunkett's counsel told the trial court that Jones, among others, "unequivocally expressed [her] bias or prejudice and disqualification," claiming that the record taken as a whole clearly reflected as much. Counsel argued that the ultimate recantation was not sufficient to prevent disqualification. The trial court concluded otherwise:

> Based on *Cortez* and the standards set forth by *Cortez*, the Court, taking all the factors, the record as a whole, taking in consideration the veniremen's tone and demeanor, the quickness when the follow-up questions were asked when they all indicated, each of the three indicated that they could follow the Court's instructions provided, the Court is satisfied that there was a level of confusion in the original set of questions, not a full understanding due to lack of experience, whatever the factors may in fact be, the Court is satisfied that when they were explained fully all aspects of what is being required, to follow the facts that were provided as well as the Court's instructions, they did clearly indicate that they could follow the Court's instructions. So the Court is satisfied that they were not unequivocal at the time that they entered their previous statements, so the Court will stand by its rulings as previously entered.

Because Plunkett's for-cause challenge to Jones was overruled and because she wanted Jones off the jury, she was forced to use a peremptory challenge on Jones, and the process empaneled another veniremember that Plunkett did not want.

4

Plunkett claims that the trial court abused its discretion in denying her for-cause challenge to Jones.[6] Plunkett points to Jones' initial statement that she would require Plunkett to prove her case by clear and convincing evidence as demonstrating "unequivocal bias," in spite of Jones' apparent rehabilitation on questioning by the trial court. The entirety of the record leaves little doubt, Plunkett claims, that Jones was biased against Plunkett's medical malpractice claims. *See Cortez v. HCCI-San Antonio, Inc.*, 159 S.W.3d 87, 92 (Tex. 2005) (if entirety of record clearly shows material bias of panel member, recantation of that bias is usually insufficient to prevent disqualification).

A person who has a bias or prejudice in favor of or against a party is disqualified to serve as a petit juror in that case. TEX. GOV'T CODE ANN. § 62.105(4) (West 2013); *Murff v. Pass*, 249 S.W.3d 407, 411 (Tex. 2008). "Voir dire examination protects the right to an impartial jury by exposing possible improper juror biases that form the basis for statutory disqualification." *Vasquez*, 189 S.W.3d at 749. "Statements of partiality may be the result of inappropriate leading questions, confusion, misunderstanding, ignorance of the law, or merely 'loose words spoken in

---

[6]Plunkett also complains that her questioning of Jones was impermissibly truncated by the trial court when it sought to clarify Jones' responses regarding the appropriate standard of proof. As a result, Plunkett claims that she was denied the opportunity to further develop the basis of her challenge for cause to Jones. To the extent this issue has been appropriately designated as a point of error on appeal, we find that it was not preserved in the trial court for our review. To preserve error for appeal, the record must show that the complaint was made to the trial court by a timely request, objection, or motion which states the grounds for the ruling with sufficient specificity to make the trial court aware of the complaint. TEX. R. APP. P. 33.1(a). To preserve a complaint that voir dire was improperly restricted, a party must timely alert the trial court as to the "specific manner in which it intends to pursue the inquiry." *Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 758 (Tex. 2006). Here, because counsel for Plunkett did not object or otherwise advise the trial court that he believed questioning of Jones was improperly restricted, this complaint has not been preserved for our review.

warm debate,' and do not necessarily establish disqualification." *Murff*, 249 S.W.3d at 411 (quoting *Cortez*, 159 S.W. 3d at 92).

In *Cortez*, for example, an automobile insurance claims adjuster stated that he "would feel bias" sitting as a juror in a negligence case against a nursing home because his experience might have given him "preconceived notions" and that he had seen lawsuit abuse many times. The panel member felt that the defendant was "in a way . . . starting out ahead." *Cortez*, 159 S.W.3d at 90. The panel member agreed, however, that he did evaluate automobile claims that had merit and that he was "willing to try" to decide the case based on the law and the evidence. The trial court denied Cortez' challenge for cause.

In concluding that the challenge for cause was appropriately denied, the high court recognized that "bias, in its usual meaning, is an inclination toward one side of an issue . . . but to disqualify, it must appear that the state of mind of the juror leads to the natural inference that he will not or did not act with impartiality." *Id*. at 94 (quoting *Compton v. Henrie*, 364 S.W.2d 179, 182 (Tex. 1963)).

The "relevant inquiry is not where jurors start but where they are likely to end," and "an initial 'leaning' is not disqualifying if it represents skepticism rather than an unshakeable conviction." *Id*.

Here, Jones expressed an apparent bias to the effect that she would require something "along the line" of clear and convincing evidence when a doctor or a hospital is sued. When a panel member expresses "what appears to be bias," nothing prohibits "further questioning that might show just the opposite or at least clarify the statement." *Id*. at 93. Further questioning will

6

either reinforce the genuine nature of the bias or it may prevent a mistaken disqualification of an impartial panel member. *Id*. Although Jones initially expressed a problem with the standard of proof in light of the example of a "feather" of more credible evidence, she later stated that she would apply the appropriate standard of a preponderance of the evidence:

> THE COURT: And you haven't heard the actual instructions that I'm going to give you. If I instruct you that the law is that all the Plaintiff has to meet for its burden of proof is the definition that was provided here, are you saying you would not follow my instructions?
>
> [Panel Member Jones]: No, I'd follow the law.
>
> THE COURT: You would follow the law. Because the instruction is it's not clear and convincing.
>
> [Panel member Jones]: Okay.
>
> THE COURT: Now, maybe for your personal satisfaction, but would you be able to set aside --
>
> [Panel member Jones]: Yes.
>
> THE COURT: -- what your personal deal is and follow the law in this case?
>
> [Panel member Jones]: Yes.
>
> THE COURT: Because that's the important thing. We want you making a decision solely on the evidence presented as well as the law that's presented, and the question is, can you do that?
>
> [Panel member Jones]: Yes.

The trial court determined that Jones' tone, demeanor, and responses to follow-up questions, together with clarification of the court's instructions and Jones' indication that she could and would follow those instructions indicated that she was not biased against Plunkett. Trial judges are in the "best position to evaluate the sincerity and attitude of individual panel members." *Murff*,

7

249 S.W.3d at 411. Given Jones' response, affirming that she could and would apply the appropriate standard of proof, the trial court acted within its discretion in denying the challenge for cause. We overrule this point of error.

*(2)    It Was Not Error to Admit the Testimony of Expert Witness Stephen Koch, M.D.*

Plunkett claims that the trial court erred in permitting defense expert Stephen Koch, M.D., to testify that Plunkett developed a pulmonary embolism which may have caused his respiratory arrest because that opinion (a) was not timely disclosed and (b) was not based on reasonable medical probability.

*(a)    Timely Disclosure of Koch's Opinion*

The sponsor of an expert's testimony must timely disclose "the general substance of the expert's mental impressions and opinions and a brief summary of the basis for them . . . ." TEX. R. CIV. P. 194.2(f)(3). Unless the court orders otherwise, disclosure pursuant to this Rule must generally be accomplished by the later of thirty days after the service of the disclosure request or sixty days before the discovery period ends. TEX. R. CIV. P. 195.2(b). If a party fails to timely provide an adequate response pursuant to Rule 194.2(f), testimony from such expert is subject to exclusion "unless the trial court determines that the party seeking to introduce the evidence established either (1) the existence of good cause for its failure or (2) that it would not unfairly surprise or prejudice the other parties to admit the evidence despite the inadequate discovery response." *Cunningham v. Columbia/St. David's Healthcare Sys., L.P.*, 185 S.W.3d 7, 11 (Tex. App.—Austin 2005, no pet.) (citing TEX. R. CIV. P. 193.6(a), (b)).

8

The trial court's second amended scheduling order required the defendants to designate expert witnesses and to provide expert reports by November 3, 2014. Koch's report was provided to Plunkett via letters dated October 29 and 30, 2014. The report purports to contain Koch's "opinions regarding the medical care and treatment of Curtis Plunkett." In his report, Koch opines that the "nasal DHT [Dobhoff] tube did not have any impact, either direct or indirect, on this patient's sudden and unexpected postoperative clinical deterioration." Instead, Koch opined, "[M]ore likely than not this patient had a primary dysrhythmia (history of syncope) since his decline was sudden and occurred within minutes of his arrival to the medical floor. I believe that his dysrhythmia led to sudden respiratory decline, which prompted the code." The report makes no mention of a pulmonary embolism. Plunkett contends that, because Koch's report did not include his opinion that a pulmonary embolism may have caused Plunkett's respiratory event, the trial court erred in permitting Koch to so testify.

In his deposition taken September 14, 2015, Koch testified that he believed Plunkett had a pulmonary embolism. Koch frankly admitted that his opinion was not expressed anywhere in his report and explained that he developed the opinion after writing the report and in reviewing more "of the deposition material." On September 18, Plunkett filed a motion to exclude defense expert testimony of pulmonary embolism as a possible cause of Curtis' death. After an October 8 hearing, the trial court denied Plunkett's motion. Koch was permitted to express his opinion regarding pulmonary embolism at trial, to the effect that a "possible pulmonary embolism, a blood clot to the lungs, could do this, less likely than a cardiac event." Koch ultimately testified, however, that,

9

based on a reasonable degree of medical probability, the most likely cause of Plunkett's respiratory arrest was a primary cardiac event.

The decision to permit Koch to testify on the subject of pulmonary embolism rests within the sound discretion of the trial court. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *Int'l Transquip Indus., Inc. v. Browning/Ferris Indus., Inc.*, 54 S.W.3d 37, 40 (Tex. App.—Texarkana 2001, no pet.). Here, it is undisputed that Koch was timely designated as an expert witness, and his report was timely provided to Plunkett. Plunkett was able to explore the basis of Koch's opinion regarding pulmonary embolism in detail during Koch's deposition, which took place more than thirty days before the commencement of trial on October 19, 2015. Although the better practice is to include all expert opinions in a report that is timely provided, we cannot say that the trial court's decision to allow Koch to testify as to an opinion which was not included in his report—that Curtis may have suffered from a pulmonary embolism—in any way unfairly surprised or prejudiced Plunkett. We find no abuse of discretion with respect to the timely-disclosure question.

*(b)     No Abuse of Discretion in Permitting Koch's Pulmonary-Embolism Testimony*

Plunkett sought to exclude Koch's testimony, that Curtis suffered a pulmonary embolism as the cause of his respiratory failure, on the assertion that such opinion testimony was based on mere conjecture, speculation, or possibility. Expert testimony is admissible if the expert is qualified and the testimony is relevant and based on a reliable foundation. *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006) (citing *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001)). The trial court makes the initial determination about whether the expert

10

and the proffered testimony meet these requirements and has broad discretion to determine admissibility. *Wilkins*, 47 S.W.3d at 499. We will reverse only if there is an abuse of that discretion. *Id*.; *see also Larson v. Downing*, 197 S.W.3d 303, 304–05 (Tex. 2006). A trial court abuses its discretion if it acts without reference to any guiding rules or principles. *Robinson*, 923 S.W.2d at 558.

Here, there is no issue regarding Koch's expert qualifications. Instead, Plunkett contends that, because Koch's testimony with respect to a possible pulmonary embolism is merely speculative and conclusory, such opinion is neither relevant nor reliable and should have been excluded from evidence. Expert testimony that is not "sufficiently tied to the facts of the case" to enable the jury to resolve a factual dispute is not relevant. *Robinson*, 923 S.W.2d at 556 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985)). In addition, an expert opinion that is based on "subjective belief or unsupported speculation" is not reliable. *Id*. at 557 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993)) In other words, the trial court is not required to admit opinion evidence that is connected to the existing case by just the "*ipse dixit* of the expert." *Mendez*, 204 S.W.3d at 801. When an expert brings to court "little more than his credentials and a subjective opinion," that opinion "is not evidence to support a judgment." *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997) (quoting *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 421–22 (5th Cir. 1987)). This Court is not permitted to fill in gaps in an expert's testimony by guessing what the expert likely meant or by drawing inferences. *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.). "[C]ausation cannot be inferred; it must be clearly stated." *Tenet Hosps., Ltd. v. Love*, 347 S.W.3d 743, 755

11

(Tex. App.—El Paso 2011, no pet.). The party offering expert testimony bears the burden to establish that the expert is qualified to offer the testimony and that the testimony is relevant and is based on a reliable foundation. *See Robinson*, 923 S.W.2d at 556.

We turn to Koch's testimony to determine whether the trial court acted within its discretion in admitting his opinions regarding pulmonary embolism. At trial, Koch testified on direct examination that Curtis' death was caused by a primary cardiac arrest, explaining that Curtis had a long history of heart rhythm problems and fainting episodes. Koch was then asked what fainting episodes "have to do with the possibility of a primary cardiac event?" Koch explained:

> Many fainting episodes are due to primary heart rhythm problems. Your heart has an abnormal heart rhythm, you don't get enough blood to your brain, and you faint. He also had some question of coughing episodes that produced fainting, but other episodes were not preceded by a cough. So he has sort of, you know, a predisposition to that. He also had known peripheral vascular disease, and more likely than not he had coronary artery disease, heart problems. So either heart rhythm, a heart attack would've caused this. Possible pulmonary embolism, a blood clot to the lungs, could do this, less likely than a cardiac event.

On cross-examination, Koch explained that pulmonary embolisms arise from deep vein thromboses, usually in the pelvis or the legs. Deep vein thrombosis can be caused by a remote or acute vein injury, clotting abnormalities, or stasis. Koch further testified that there was no evidence that Curtis had (1) a vein injury in the deep veins of the legs or the pelvis, (2) clotting abnormalities, or (3) stasis other than at surgery, during which time compression stockings were used to prevent the effects of stasis. Koch testified that there was no evidence that Curtis had any risk factors for developing a pulmonary embolism, other than "being hospitalized and having had surgery." Koch further opined that Curtis' clinical presentation, arterial blood gas results, and the suddenness with which he stated that he was having trouble breathing constituted evidence of a pulmonary

12

embolism. None of Curtis' doctors, according to the record, suspected pulmonary embolism, and no testing was done to determine if Curtis had developed one.

In making the decision relative to the admission of Koch's testimony on the issue of pulmonary embolism, the trial court had before it Koch's complete deposition testimony offered in response to Plunkett's motion to strike Koch's testimony. When asked what evidence there was to conclude Curtis had a pulmonary embolism, Koch testified, "More likely than not, on the clinical presentation and the -- and the blood gas. Acute pulmonary emboli will have hemodynamic events similar to this. Patients suddenly saying 'I can't breathe,' that's classic presentation." Koch further opined that the arterial blood gas of 19:20 was consistent with pulmonary embolism because "[a]n acute pulmonary embolism will produce extreme hypoxemia and hypoventilation. It's blockage of -- hypoventilation can happen because you're not ventilating the lung or you're not perfusing the lung. Either way, you can get $CO_2$ retention." Curtis' hospitalization and surgery also presented a risk factor for deep vein thrombosis. Koch testified that stasis of two to four hours, at minimum, can lead to a potential thrombus. Acute pulmonary embolism can also account for the pink frothy secretions noted on suctioning in this case. Based on these factors, Koch testified that pulmonary embolism was within the differential diagnosis for Curtis.

In summary, the record before us indicates that Koch reviewed Curtis' medical records and the deposition testimony of both fact and expert witnesses. His opinions and conclusions were expressly based on his experience, knowledge, skill, and training as a physician. Based on these sources and his own experience, Koch opined that Curtis' respiratory arrest was caused by a sudden syncopal event. Koch then opined that a sudden syncopal event may be caused by a pulmonary

embolism. Koch's testimony revealed that Curtis had two risk factors for pulmonary embolism—being hospitalized and having had surgery—in addition to clinical presentation, such that pulmonary embolism was part of his differential diagnosis. Consequently, Koch opined that pulmonary embolism was, more likely than not, a potential secondary cause of Curtis' respiratory decline which prompted the code.

In support of the claim that the Hospital failed to establish the admissibility of Koch's testimony, Plunkett relies on *Grider v. Naaman*, 83 S.W.3d 241 (Tex. App.—Corpus Christi 2002), *rev'd on other grounds by* 126 S.W.3d 73 (Tex. 2003). In *Grider,* a surgeon cut the patient's brachial plexus nerve roots causing total and permanent disability to her left arm and hand, while ostensibly performing a biopsy of an undefined mass in the mediastinum area of the chest. *Id.* at 244–45. Naaman's expert offered a defensive theory that was "unsubstantiated by fact, science or medical precedent" to the effect that the applicable standard of care did not apply if the patient had an abnormal anatomy. The court noted that, even if this theory had been properly based on scientific, technical, or other specialized knowledge, it was "no evidence in this case because there was no proof appellant's anatomy was abnormal in any respect." *Id.* at 246. Because this theory relied on a fact that was materially different from the evidence, it was mere speculation. *Id.*

Plunkett also relies on *Tsai v. Wells*, 725 S.W.2d 271 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.), in which the medical facts likewise did not support the expert's defensive theory. Tsai underwent surgery for repair of uterine broad ligament lacerations. Tsai later developed pelvic inflammatory disease caused by the use of silk sutures in repairing the lacerations. *Id.* at 272. Tsai testified that Wells reported to her, following the surgery, that she had sexual contact

14

with a person infected with gonorrhea. *Id*. 274. Despite the fact that there was no evidence that Wells contracted gonorrhea, Tsai opined that, *if* Wells had gonorrhea, then gonorrhea could have caused the pelvic inflammatory disease. *Id*. In upholding the trial court's decision to exclude all evidence regarding gonorrhea, the court characterized Tsai's opinion as mere speculation, because there was no evidence that Wells contracted gonorrhea. *Id*.

In this case, unlike *Tsai* and *Grider*, Koch's testimony was based on facts present in the medical record, as previously outlined. We, therefore, cannot conclude that the trial court abused its discretion in permitting Koch to testify regarding pulmonary embolism as a potential secondary cause of Curtis' respiratory decline which prompted the code.[7] We overrule this point of error.

*(3)* *It Was Not Error to Admit the Testimony of Expert Witness Charles Bloomer, D.D.S.*

Plunkett also contends that the trial court abused its discretion in allowing Charles Bloomer, D.D.S.,[8] to testify that, in his opinion, the Dobhoff tube did not cause laryngospasm[9] and that Curtis' airway crisis was caused by a cough. Plunkett contends these opinions should have been excluded because they were not timely disclosed in Bloomer's report.

If a party fails to timely provide an adequate response pursuant to Rule 194.2(f) of the Texas Rules of Civil Procedure, testimony from such expert is subject to exclusion "unless the trial court determines that the party seeking to introduce the evidence established either (1) the existence of good cause for its failure or (2) that it would not unfairly surprise or prejudice the

---

[7]At trial, Koch testified that a "possible pulmonary embolism . . . could do this, less likely than a cardiac event." Koch believed, however, that the most likely cause of Curtis' respiratory arrest was a primary cardiac event.

[8]Bloomer was an expert called to testify on behalf of Duke at trial.

[9]That opinion by Bloomer was based on a study of twenty children who had an airway exchange catheter.

other parties to admit the evidence despite the inadequate discovery response." *Cunningham*, 185 S.W.3d at 11 (citing TEX. R. CIV. P. 193.6(a), (b)).

The trial court's scheduling order required Duke to designate expert witnesses and provide expert reports by November 3, 2014. In accordance with this order, Bloomer produced a report dated October 23, 2014. In his report, Bloomer succinctly stated eleven opinions[10] and concluded that the position of the Dobhoff tube "did not cause any obstruction of the airway or lead to the development of respiratory arrest nor the cardiovascular event that lead to Mr. Plunkett's death."

---

[10]Those opinions are:

    1.     Surgical procedure that included open and closed reduction of facial fractures with intermaxillary fixation was appropriate.

    2.     Patient[s] who have their teeth wired are anxious in the immediate postoperative period.

    3.     Placement of a feeding tube was done to aid in postoperative recovery and comfort in a patient with his denture/teeth wired.

    4.     Orders to not feed patient until feeding tube position was confirmed was appropriate and was followed by medical staff.

    5.     Stat radiographs are normally read by the radiologist and reported to the physicians by telephone as was done in this case.

    6.     It is not normal or customary for the surgeon to read the post op stat radiographs unless they work full time in the hospital such as in a teaching hospital.

    7.     PACU data confirms that the patient was not in any respiratory distress for approximately 4 hours, even though the feeding tube was not located in the stomach and its position had not been confirmed.

    8.     The patient became anxious when he was transferred to the floor.

    9.     The feeding tube might have moved due to the multiple attempted closed mouth intubations, tracheotomy attempt, nasogastric tube placement, mouth open intubations.

    10.    The order for placement of wire cutters to the head of bed was noted in the orders and was followed by the medical staff.

    11.    Depositions confirm that wire cutters were attached to the foot of the patient's bed.

16

Plunkett deposed Bloomer on August 5, 2015, at which time Bloomer opined that the Dobhoff tube did not cause laryngospasm, explicitly tied to a case study, and that Plunkett's airway crisis was caused by a cough. Plunkett, relying on *$27,877 v. State*, 331 S.W.3d 110, 120 (Tex. App.—Fort Worth 2010, pet. denied), complains that the trial court's refusal to exclude or to limit Bloomer's expert testimony allowed trial by ambush. We disagree. Bloomer's report stated that the position of the Dobhoff tube did not obstruct the airway or cause Curtis' death. In his deposition, Bloomer merely explained the basis of that opinion.

The decision to permit Bloomer to testify that the Dobhoff tube did not cause laryngospasm and that Plunkett's airway crisis was caused by a cough rests within the sound discretion of the trial court. *See Robinson*, 923 S.W.2d at 558; *Int'l Transquip Indus., Inc.*, 54 S.W.3d at 40. Here, it is undisputed that Bloomer was timely designated as an expert witness and that his report was timely provided to Plunkett. Plunkett was able to explore the basis of Bloomer's opinions regarding laryngospasm in detail during Bloomer's deposition, which took place more than thirty days before the commencement of trial on October 19, 2015. Although the better practice is to include all expert opinions and the basis of those opinions in a report that is timely provided, we cannot say that the trial court's decision to allow Bloomer to testify as to the basis of his primary opinion—that the Dobhoff tube did not cause laryngospasm—in any way unfairly surprised or prejudiced Plunkett. We find no abuse of discretion and therefore overrule this point of error.

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:     November 4, 2016
Date Decided:       December 19, 2016